UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KENNETH RACKEMANN,

    Plaintiff,

v.                                               CAUSE NO. 3:20-CV-214-DRL-MGG

ROBERT CARTER, JR. *et al.*,

    Defendants.

OPINION & ORDER

Kenneth Rackemann is a prisoner at the Westville Control Unit. Without a lawyer, he filed a motion for a temporary restraining order that the court denied but construed as a motion for a preliminary injunction. The motion asked the court to order "the Westville Correctional Facility's Warden, John Galipeau, to arrange for Plaintiff to be provided a thorough medical exam by a competent medical physician to diagnose and treat his longstanding left flank severe pain and numbness." ECF 9 at 1. The Westville Correctional Facility Warden was ordered to respond to the motion in his official capacity "(with supporting medical documentation and declarations from other staff as necessary) describing/explaining the status of Kenneth Rackemann's left flank pain and numbness, what medical evaluations and treatment he has received since January 1, 2020, and what future course of treatment has been prescribed." ECF 11 at 4. The Warden filed a report, and Mr. Rackemann filed a reply. ECF 15, 20.

The medical records show Mr. Rackemann has many medical problems: asthma, diabetes, earaches, hyperlipidemia, hypertension, and pain related to his abdomen, back, ear, and foot. ECF 15-2; ECF 20 at 5. The records also show he has received numerous medications since January 9, 2020: acetaminophen, atorvastatin, benztropine, ciprofloxacin, lisinopril, metformin, metoprolol tartrate,

remeron, and xopenex HFA. *Id.* He receives medications at least twice a day, every day. *Id.* However, the preliminary injunction motion is not about the whole range of his conditions and treatments.

The preliminary injunction motion is solely about the treatment of his left flank pain and numbness. Nevertheless, it is relevant that he has extensive and ongoing contact with healthcare providers even if they are not specifically treating his left flank pain every time they interact with him because these are opportunities for him to communicate with healthcare providers and for them to evaluate his condition even if only by an ongoing or cursory observation. Since January 1, 2020, several different healthcare providers have had numerous opportunities to observe him over many months.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). To obtain a preliminary injunction, the moving party must show: (1) he will suffer irreparable harm before the final resolution of his claims; (2) available remedies at law are inadequate; and (3) he has a likelihood of success on the merits. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 323-24 (7th Cir. 2015). An injunction ordering the defendant to take an affirmative act rather than merely refrain from specific conduct is "cautiously viewed and sparingly issued." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (quotation marks and citation omitted).

Inmates are entitled to receive constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Prisoners are "not entitled to demand specific care [nor are they] entitled to the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Because the record demonstrates Mr. Rackemann is receiving constitutionally adequate medical care, he has no chance of success on the merits, and the preliminary injunction motion must be denied.

Mr. Rackemann's left flank pain and numbness is a chronic problem he has had at least since he entered the Indiana Department of Correction in April 2016. *Rackemann v. Robinson*, 2:18-CV-232

(S.D. Ind. filed May 16, 2018), Sum. J. Order, ECF 108 at 3. It is related to his kidneys and has resulted in blood in his urine. *Id.* at 4. He had a kidney stone and a stent surgically placed to help it pass. *Id.* at 6. The stent was subsequently removed. *Id.* at 9.

Since January 1, 2020, Mr. Rackemann has had numerous contacts with medical staff in addition to receiving medication at least twice a day, every day. Unrelated to his left flank pain, he was seen by a nurse on January 9, 2020, when he refused a weekly blood test for diabetes. ECF 15-2 at 2. He was also seen by a nurse on February 1, 2020, when he complained about not receiving weekly blood tests. At that time, he was assessed to be in stable condition, and the doctor was notified of his concerns. ECF 15-2 at 14-15. Also unrelated to his left flank pain, he was seen by a nurse on January 13, 2020, when he was prescribed drops for ear pain. ECF 15-2 at 4. He was seen again by a nurse on January 15, 2020, as a follow up for his ear pain. ECF 15-2 at 12.

On January 14, 2020, Mr. Rackemann was seen by Dr. Liaw for a chronic care visit where he was evaluated for five chronic conditions including pain. ECF 15-2 at 7. Mr. Rackemann argues his physician appointments are limited to chronic care visits unrelated to his left flank pain. ECF 20 at 4. However, he acknowledges pain management was a topic of the chronic care appointment. *Id.* at 5. He also acknowledges he explained his left flank pain during this appointment and that Dr. Liaw prescribed him pain medication. *Id.* Though he wants additional appointments with his physician, the Constitution does not mandate a specific number or frequency of visits.

At this appointment, they discussed Neurontin, which Mr. Rackemann had taken in the past. ECF 15-2 at 7. Mr. Rackemann states he did not ask for neurontin. ECF 20 at 8. However, it is irrelevant whether he asked for it or merely mentioned that he had taken it in the past. What is relevant is that Dr. Liaw concluded it would not be appropriate to prescribe it again at that time because he did not have "any acute distress or any objective signs of distress." ECF 15-2 at 8. Mr. Rackemann argues Dr. Liaw did not perform an adequate exam to be able to know if he was in distress, but his

3

only explanation for why the exam was inadequate is that he was handcuffed and shackled during the exam. ECF 20 at 8. However, such restraints do not inherently prevent a physician from examining a patient, and he does not dispute that Dr. Liaw took his vital signs, evaluated his body systems, and noted that he had abdominal pain. ECF 15-2 at 8-9. Moreover, the restraints were clearly justified given that "[o]n March 1, 2019, Mr. Rackemann attacked Dr. Byrd in the WVCF medical unit, striking him multiple times in the head [requiring he] be forcibly removed from the exam room." *Rackemann v. Robinson*, 2:18-CV-232 (S.D. Ind. filed May 16, 2018), Sum. J. Order, ECF 108 at 9 (citations omitted).

Though Dr. Liaw did not observe any objective signs of distress, he prescribed two 325 mg acetaminophen every six hours as needed for pain. Mr. Rackemann says that prescription expired on January 27, 2020. ECF 20 at 5. Medical notes from that visit show the prescription "stop date" as January 27, 2020. ECF 15-2 at 10. However, all of his medications have a "stop date" and acetaminophen was still on his list of medications on February 1, 2020, and February 13, 2020. ECF 15-2 at 14 and ECF 15-2 at 18-19. Perhaps it was renewed, but even if it was not, acetaminophen is an over-the-counter medication that does not require a prescription. When he saw a nurse on February 20, 2020, he was told to continue to take over-the-counter Tylenol (acetaminophen). ECF 15-2 at 22. This may have required that he buy it from commissary, but he does not dispute that he could afford to do so. When he filed this case in March, he had $339.86 in his inmate trust account and had received an average of $261.24 a month for the prior six months. ECF 2 at 2.

After the visit on January 14, 2020, Dr. Liaw asked guards about their observations of Mr. Rackemann. ECF 15-2 at 6. This is evidence of ongoing monitoring of his condition. They told Dr. Liaw that Mr. Rackemann walked around during his recreation periods. ECF 15-2 at 6. Mr. Rackemann does not dispute that he walks around during recreation. ECF 20 at 6. Rather, he disagrees with Dr.

Liaw about whether his walking during recreation is evidence that he can perform the activities of daily living and does not need narcotic-like medications. ECF 20 at 6.

On January 21, 2020, Dr. Liaw amended the medical notes for the January 14, 2020, visit. ECF 15-2 at 6. He repeated his previous conclusion that there was "no indication for neurontin at this time." ECF 15-2 at 6. However, he went on to note, if "considering neurontin [in the future] please review [four prior] physician notes from" 2018. Not all of the prior notes caution against prescribing neurontin. One is described as, "discussion of the pt's LLQ [patient's lower left quadrant – a reference to his left flank] and workup up to that point, which is another frequently cited source of pain." ECF 15-2 at 6. This demonstrates Dr. Liaw knew Mr. Rackemann's medical history and wanted it considered as a part of his ongoing care. One of the other notes, written by a different physician, stated that Mr. Rackemann "is a known suboxone dealer to custody (providing a highly trafficked medication like neurontin to a known dealer is not ideal)." ECF 15-2 at 6. Mr. Rackemann argues he is not a suboxone dealer. ECF 20 at 7. However, it is not relevant today whether he was a suboxone dealer in 2018. Dr. Liaw made the decision not to prescribe neurontin because he did not believe Mr. Rackemann needed it. However, if it was needed in the future, Dr. Liaw wanted the prior doctor's note considered as a part of the decision-making process at that time.

On February 4, 2020, Mr. Rackemann filed four healthcare requests about four different medical issues. ECF 15-2 at 40-43. All four were answered the next day. Three of them concerned unrelated medical issues. The fourth complained he had "no medications" for his lower left flank pain. The response reminded him he had been prescribed Tylenol (acetaminophen) three weeks earlier.

On February 8, 2020, he filed a Health Care Request asking to be seen for abdominal pain. ECF 15-2 at 39. On February 10, 2020, he filed two Health Care Requests. ECF 15-2 at 37-38. One asking for an evening meal because he was diabetic and the other saying he was having painful urination and abdominal pain. ECF 15-2 at 37-38. On February 11, 2020, he filed another Health Care

5

Request complaining about painful urination and abdominal pain. ECF 15-2 at 36. On February 13, 2020, he was seen by a nurse who took his vital signs and ordered a urinalysis. ECF 15-2 at 17-20. Though Mr. Rackemann did not see Dr. Liaw, the physician provided medical treatment by ordering a complete abdominal x-ray. ECF 15-2 at 16.

Three days later, on February 16, 2020, Mr. Rackemann filed a Health Care Request complaining about not receiving treatment for abdominal pain on his left side. ECF 15-2 at 35. It was answered the next day explaining the x-ray, urinalysis, and blood test results were not back yet. On February 17, 2020, he filed a Health Care Request complaining about blood in urine and left side pain. ECF 15-2 at 34. On February 18, 2020, he filed a Health Care Request asking for a treatment plan for his left side pain. ECF 15-2 at 33. He was seen by a nurse on February 20, 2020, where he again complained of pain on his left side. ECF 15-2 at 21. She noted he did not appear to have any signs of distress and told him to continue to take Tylenol (acetaminophen). ECF 15-2 at 22. Mr. Rackemann argues the acetaminophen did not stop his pain, but he does not say when he took it, how much he took, nor whether it lessened the pain at all, albeit not providing full relief. ECF 20 at 5.

On February 21, 2020, and On February 28, 2020, he filed unrelated Health Care Requests complaining about being charged for a sick call visit and about stomach pain. ECF 15-2 at 30 and 32.

On February 27, 2020, he filed a Health Care Request saying a urine test ordered on February 25, 2020, had not been performed. ECF 15-2 at 31. He was told Dr. Liaw had explained the plan of care and no new orders had been issued. On March 9, 2020, he filed a Health Care Request complaining he was not receiving attention for his chronic left flank pain and asking for an MRI. ECF 15-2 at 29. He was reminded he was receiving treatment; an x-ray had been performed, and no MRI had been ordered. He was seen by a nurse on March 26, 2020 to renew various medications, but neither the medical record nor Mr. Rackemann indicate there was any discussion of left flank pain. ECF 15-2 at 25-28.

Finally, Mr. Rackemann states he met with Dr. Liaw and was told the test results "revealed a left renal kidney stone." ECF 20 at 3. He does not provide the date of this visit, but it appears to have happened sometime after the response brief on April 30, 2020, and the reply brief on June 10, 2020. Despite saying he was given a diagnosis by Dr. Liaw, Mr. Rackemann argues he "is undiagnosed due to Dr. Liaw's intentional mistreatment." ECF 20 at 4. Mr. Rackemann's own brief (a mere one page earlier) demonstrates this is not true.

Mr. Rackemann is asking the court to order that he receive a thorough medical exam by a competent medical physician to diagnose and treat his chronic left flank pain. However, the record demonstrates he has been examined, diagnosed, and is receiving treatment. There is no indication Dr. Liaw is not a competent physician. Mr. Rackemann disagrees with the medical care he is receiving, but that does not make his care constitutionally inadequate because "a disagreement with medical professionals . . . does not state a cognizable Eighth Amendment claim." *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003). He does not believe he is receiving proper medical care. It appears he is, but

> medical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. The Constitution is not a medical code that mandates specific medical treatment.

*Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (quotation marks, citations, parenthesis, and brackets omitted). He says he is in pain, but "[t]o say the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

> Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations. A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.

*Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (quotation marks and citation omitted). This is why courts "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (quotation marks and citation omitted).

Mr. Rackemann raises various other objections, but none of them undermine the conclusion that he has been examined, tested, diagnosed, and is receiving treatment on an ongoing basis. Nor do they demonstrate that his healthcare providers are incompetent. Accordingly, the court DENIES the motion for preliminary injunction (ECF 9).

SO ORDERED.

June 18, 2020                                             *s/ Damon R. Leichty*
                                                          Judge, United States District Court